## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:04-CV-2170** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **DONALD C. WINTER, Secretary of the** | : | |
| **United States Department of the Navy,[1]** | : | |
| **Defendant** | : | |

### MEMORANDUM

Before this Court are Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Doc. No. 41), Plaintiff's motion for default judgment or for a spoliation instruction (Doc. No. 39), Plaintiff's motion to continue using the pseudonym John Doe (Doc. No. 83), and Plaintiff's motion to re-open the record (Doc. No. 97). The parties have briefed the motions, and they are ripe for disposition. Upon consideration of the parties' arguments, a thorough review of the record, and for the reasons set forth below, the Court will grant Defendant's motion for summary judgment, and deny Plaintiff's motions as moot.

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court has substituted Defendant Winter as the successor to the previously named Defendant, Gordon R. England, Secretary of the United States Navy.

I.      **BACKGROUND**

A.      **Factual Background**[2]

John Doe is a former Navy employee.  In 2001, he served as a Supervisory Information

Technology Specialist for a branch of the Navy, now referred to as NAVSISA (Naval Supply

Information Systems Activity), in Mechanicsburg, Pennsylvania.  He served in this capacity until

January 2002, when he was transferred to a nonsupervisory position as a Project Officer.  The

circumstances surrounding that transfer represent the core of this action.

In his capacity as a Supervisory Information Specialist, Doe supervised a number of

employees, including Ron Sivak, Julie Mock, Dave Brunner, and David Kramer.  Shortly after

these employees began working under Doe, they began filing workplace complaints and union

grievances against him.  Doe's superiors consistently supported him in his role as supervisor and

determined that the allegations against him were baseless.  Nevertheless, these employees

---

[2] Local Rule 56.1 provides that a motion for summary judgment must be accompanied by
"a separate, short and concise statement of the material facts, in numbered paragraphs, as to
which the moving party contends there is no genuine issue to be tried."  Additionally, the rule
demands that an opposing party "include a separate, short and concise statement of the material
facts, responding to the numbered paragraphs set forth in the statement required in the foregoing
paragraph, as to which it is contended that there exists a genuine issue to be tried."  Id.  A failure
to file a counter-statement equates to an admission of all of the facts set forth in the movant's
statement.  This Local Rule serves several purposes.  First, it is designed to aid the Court in its
determination of whether any genuine issue of material fact is in dispute.  Second, it affixes the
burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in Celotex Corp. v.
Catrett, on the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the
depositions, answers to interrogatories, and admissions on file, designate specific facts showing
that there is a genuine issue for trial."  477 U.S. 317, 324 (1986) (internal quotation marks
omitted) (emphasis added).  Despite the clear language of the rule, the important purposes it
serves, and the voluminous record in this case, Plaintiff has not submitted the requisite counter-
statement.  All facts included in Defendant's statement must therefore be deemed admitted.
Nevertheless, the Court has engaged in an thorough, independent review of the record, and
where certain facts are not included in the statement but are relevant to the case, the Court will
supplement the factual background.

continued to attempt to bait Doe into overreacting.  For example, knowing that Doe was Jewish,

Sivak told Doe that "[he did not] like working in this Auschwitz work environment;" posted a

sign at his desk that read "Arbeit Macht Frei," referring to the infamous slogan posted at Nazi

concentration camps; and after Doe asked him to take the sign down, Sivak replaced it with one

featuring the same message, albeit in Cyrillic lettering   (Doe Dep. 32-37; Doe Dep. Ex. 20, at 5.)

Sivak also placed bullet-hole decals on his desk, which to Doe signaled a veiled threat of

workplace violence.  (Id.)

Still, Doe's supervisors supported him.  On December 12, 2001, the NAVSISA

management held a meeting with Doe to discuss the complaints and problems Doe was

experiencing with his subordinate employees.  At the meeting, Doe's supervisors discussed

methods of addressing the problems, and even asked Doe for his input as to how to handle the

situation.  Ultimately, Doe suggested that he intended to confront the challenges in a professional

manner, and agreed to use progressive-discipline policies to regain control over his subordinates.

Before that meeting took place, two anonymous "hotline call" complaints were lodged

against Doe.  The first call, placed with the Inspector General's office on September 26, 2001,

included the following allegations:

> The caller stated that [Doe] sexually harassed an employee.
> [NAVSISA] removed his security clearance, but they reinstated him
> in 1999.  Currently female employees have filed numerous sexual
> harassment complaints against [Doe].  In retaliation, [Doe] revoked
> the security clearances of three employees.  He did not give a reason
> for his actions.  Those employees, however, handle or have access to
> passwords of 3,000 base employees.

(Naber Dep. Ex. 3, Aug. 4, 2005.)

In the second call, placed with the entity directly above NAVSISA (the Naval Supply

Systems Command) on November 5, 2001, the caller alleged that:

> Back in June, [Doe] assaulted a female employee and the Command
> has done totally nothing about it.  There are people back there that are
> terrified to come in, they think he may have a gun.  At times he just
> loses it, he rants and raves and screams and hollers – it's just
> unbelievable.  Wish you people could do something because FMSO
> refuses to remove him.

(Id.)[3]

Based on these hotline calls, and pursuant to established procedures, Dave Duckett (the

Director of Command Evaluation for NAVSISA) conducted a personnel investigation into the

allegations of the complaint.  In the course of the investigation, Duckett determined that the

majority of the allegations in the complaints were unsubstantiated.  But during his investigation

on the alleged revocation of Doe's security clearance, Duckett obtained copies of several

documents.  One of those documents, a letter dated August 2, 1991, indicated that Doe's

clearance had been revoked on May 14, 1991.  Another document, a letter dated May 12, 1993,

stated that upon reconsideration of the decision to revoke his security clearance, Doe would be

eligible for sensitive positions.  The third document, a copy of Doe's Electronic Personnel

Security Questionnaire (referred to as a SF-86 form) submitted by Doe in 1999 as part of a

---

[3] The Court notes of these two hotline calls, only the second is a transcription.  The first,
lodged with the Inspector General's office, is a summary of the caller's allegations.  In the briefs
related to the instant motions, Doe places significant emphasis on the fact that the transcript
included in the hotline-call report makes no reference to the revocation of Doe's security
clearance.  This apparent discrepancy lies at the foundation of many of Doe's arguments.
However, Doe's emphasis is misplaced.  In a record covering thousands of pages, it is perhaps
difficult to overlook the facts that: (1) the two hotline calls were lodged separately (with over a
month between them) and (2) the report of first hotline call is not a verbatim transcript of the
phone call.  Unlike Doe, however, the Court does <u>not</u> infer from the report of the two hotline
calls that "the caller had said absolutely nothing about Doe lying on his security clearance."
(Doe's Br. in Opp'n 10.)

security-clearance application, contained an affirmation by Doe that his security clearance had never been revoked.  Based on the discrepancy between the letters, which plainly stated that Doe's security clearance had been previously revoked, and the representations on Doe's SF-86 form, Duckett relayed his finding that Doe had potentially falsified his security-clearance application.

On January 11, 2002, the NAVSISA management met to discuss the revelations of Duckett's investigation into the hotline-call complaints.  At that meeting, Doe's supervisors agreed that the investigation should be referred to the Department of Navy Central Adjudication Facility ("DON CAF"), to resolve any issues related to Doe's possible falsification of his SF-86 form.  Additionally, Doe's supervisors agreed that plaintiff's security access should be temporarily suspended and that Doe should be transferred to another less security-sensitive position.[4]

Later that day, two of Doe's supervisors called Doe to inform him of the meeting and the substance of the hotline complaints' allegations, and to tell him that his security clearance was suspended until resolution by DON CAF of an investigation into whether he falsified his SF-86 form.  Doe told them that he filled out the SF-86 form in accordance with the advice given to him by Jean Stanley, an employee at the Security Division of NAVSISA.  Doe's supervisors indicated that the issue needed to be resolved by DON CAF.

Doe was thereafter transferred from his position as a supervisor to a nonsupervisory

---

[4] In his deposition, Doe's immediate supervisor Wayne Coyne indicated that the issue of Doe's security clearance "was taken very, very seriously, more serious than normal, I guess, at that time because it [was] so soon after 9/11."  (Coye Dep. 60.)  However, Coyne was not present at the January 11, 2002, meeting.

position as a Project Officer in the Navy/Marine Corps Internet ("NMCI") project.[5]  In the new position, Doe performed his job very effectively.  While Doe worked at NMCI, his previous position was filled.  NAVSISA then reorganized, and Doe's former position ended up on an outsourcing list.

On March 25, 2002, Doe contacted the Agency's EEO office.  The next day, Doe and his attorney met with an EEO counselor.  Doe subsequently filed a formal EEO complaint alleging six counts of discrimination on the basis of age, religion, and retaliation.  Two of the six counts related directly to Doe's permanent reassignment, two related to the security-clearance investigation, and the remaining two related to the actions of Doe's subordinate employees.  Doe's retaliation claims focused on three of Doe's prior activities: (1) his opposition to an incident of same-sex sexual harassment occurring in 1987; (2) his filing of an EEO complaint in 1991 based upon discrimination on the basis of a perceived mental disability; and (3) his initiation of EEO processes in 1998 related to allegedly discriminatory failure to promote.

On July 8, 2002, DON CAF determined that Doe did not falsify his SF-86 form, and reinstated his security clearance.  Shortly thereafter, Doe asked that his former second-level supervisor, Leonard Faerber, return him to his original supervisory position.  Faerber told Doe that he could not reinstate him to his previous position, despite DON CAF's adjudication of the security-clearance issue in Doe's favor, because Doe's reassignment was permanent, and because he was making a good contribution to the NMCI project.  At a meeting on July 12, 2002, Faerber recommended that Doe remain in NMCI.

---

[5]  That position had the same pay grade and level, as well as promotion eligibility, but Doe believed it was a "dead end" job.  (Doe Dep. 71.)

On August 17, 2002, Doe amended his EEO complaint to include two additional counts of discrimination related to the decision not to return him to his former supervisory position.  On October 8, 2002, Doe again amended his complaint to include an allegation that Defendant attempted to intimidate Doe into dropping his pending EEO complaint.

Meanwhile, Doe's resume had been referred for two promotions.  Both positions were filled by other candidates, one of whom was Jewish.  Doe was notified that he was not selected for promotion on August 16, 2002, and then on October 21, 2002.  On November 25, 2002, Doe amended his EEO complaint to include counts related to his non-promotion.

The EEOC investigated Doe's claims.  On February 13, 2004, Defendant moved to dismiss Doe's complaint without a hearing.  In his response to Defendant's motion, Doe stated that: "Based on the investigation of [Doe's] EEO Complaint by Terry Calcutt and our own discovery taken in this Matter, [Doe] is willing to limit his Complaint to" four of his reprisal claims.  (R. 224.)  On May 27, 2004 the Administrative Judge entered judgment in favor of the Defendant, but noted that "[Doe] limited his claim to reprisal discrimination based on the incidents discussed."  (R. 226.)  After his EEO complaint was dismissed, Doe agreed to take early retirement and received $25,000.

Doe thereafter brought this action.

**B.      Procedural Background**

On September 29, 2004, Doe filed his complaint in this Court.  (Doc. No. 1.)  Defendant answered on December 29, 2004.  (Doc. No. 5.)  After extensive but contested discovery, the parties filed cross-motions: Defendant moved for summary judgment and Plaintiff moved for default judgment or a spoliation instruction.  (Doc. Nos. 39, 41.)  The parties briefed the

motions.  Doe then filed a motion for permission to supplement the record and to submit a supplemental brief, which the Court granted.  (Doc. Nos. 81, 87.)  Doe then moved for permission to continue using the pseudonym "John Doe."  (Doc. No. 83).  The parties briefed the motion.  (Doc. Nos. 84, 85.)  Finally, on February 6, 2007, Doe filed another motion to supplement the record.  (Doc. No. 97), which the parties have fully briefed.  (Doc. Nos. 98-100).  The motions are ripe for disposition.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-51 (1986).  When deciding a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party, who is "entitled to every reasonable inference that can be drawn from the record."  Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

With respect to the sufficiency of the nonmoving party's evidence, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory or speculative.  Anderson, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.

Id. at 252; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.   DISCUSSION

Doe alleges employment discrimination on the basis of sex, religion, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16, discrimination on the basis of age under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), and discrimination on the basis of a perceived mental disability under the Rehabilitation Act, 29 U.S.C. §§ 791, 794a.

Defendant argues that summary judgment should be entered on Doe's discrimination claims because he failed to exhaust his administrative remedies.  Additionally, Defendant argues that summary judgment should be entered on Doe's reprisal claims because he has failed to state a prima facie claim.  Finally, Defendant argues that Doe's Privacy Act claims should be dismissed as untimely.  The Court will address these arguments in turn.

### A.   Doe's discrimination claims

Because Title VII is "the exclusive remedy for federal employees who allege discrimination in the  workplace," Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997), a plaintiff may not bring suit directly in federal court without exhausting her claims at the administrative level as required by 42 U.S.C. § 2000e-16(c).  Congress requires that a plaintiff exhaust Title VII claims at the administrative level "to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." Antol v. Perry, 82 F.3d 1291, 1296 (3d Cir. 1996).  When a plaintiff fails to exhaust her claims, summary judgment in favor of a defendant is proper.  Atkinson v. LaFayette College, 460 F.3d 447, 453 (3d Cir. 2006).

### 1.   Doe did not exhaust his age and religious discrimination claims because he abandoned them at the administrative level[6]

When a plaintiff voluntarily withdraws a claim at the administrative level, the exhaustion requirements of Title VII are not met.  As such, courts routinely hold that "[t]he voluntary withdrawal of discrimination charges during the EEO process constitutes a failure to exhaust such claims."  See, e.g., Torruellas v. Potter, 2006 U.S. Dist. LEXIS 18736, at *6-7 (S.D.N.Y. Mar. 6, 2006); see also Rivera v. United States Postal Serv., 830 F.2d 1037, 1039 (9th Cir. 1987) ("To withdraw is to abandon one's claim, to fail to exhaust one's remedies.").

At the administrative level, Doe alleged discrimination claims on the basis of age and religion, but then voluntarily withdrew them before the agency rendered its final decision.  When Defendant moved to dismiss Doe's EEO complaint without a hearing, Doe opted to limit his Complaint to four of his retaliation claims.  Accordingly, in her final decision, the Administrative Judge noted that "Complainant originally also claimed [Defendant] unlawfully discriminated against him on several occasions based on his religion (Jewish) and age (date of birth 7/15/47).  However, in his April 12, 2004 response . . . Complainant limited his claim to reprisal discrimination based on the incidents discussed."  (R. 226.)  Thus, those claims were not exhausted, and may not be raised at the federal level.  Sharon v. Yellow Freight Sys., 872 F. Supp. 839, 846 (D. Kan. 1994) ("Plaintiff voluntarily withdrew his claim of religious discrimination from the EEOC investigation and it is therefore barred by his failure to exhaust administrative remedies."); Sobel v. Eastman Kodak Co., No. 86-5391, 1987 U.S. Dist. LEXIS

---

[6] The Court notes that Doe did not include allegations of religious discrimination in his federal complaint.  However, both parties have proceeded as if Doe raised his religious discrimination claims.

6505, at *4-5 (E.D. Pa. July 16, 1987) ("plaintiff never exhausted his administrative remedies because he withdrew his charge with the EEOC before the agency passed on its merits or issued a right to sue letter").

Doe now argues that his abandonment of his age and religious discrimination claims should be excused. He advances several justifications for his failure to exhaust. First, Doe contends that his theories at the administrative level related to age and religious discrimination primarily focused on the Defendant's failure to reinstate him or promote him, whereas he is now primarily concerned with the Defendant's apparent desire to involuntarily transfer him to another position in order to placate Doe's anti-Semitic coworkers. This argument is unavailing as a factual matter. Doe's claims abandoned at the EEO level are the same as those now advanced by him in this Court.

Second, Doe alleges that he should be permitted to proceed with his claims because Defendant "misled" him with regard to the substance of the hotline calls. However, as described above, Doe's belief that the hotline calls contained no reference to Doe's security clearance is simply unsupported by the facts. Furthermore, even if Doe were correct that the agency's investigation was somehow incomplete, a withdrawal of a claim constitutes abandonment nonetheless. Torruellas, 2006 U.S. Dist. LEXIS 18736, at *6-8 (rejecting plaintiff's argument that "withdrawal was made reluctantly on the realization that there was no meaningful record to consider regarding the allegations").

Finally, although the prudential exhaustion requirements of Title VII are tempered by equitable considerations, cf. Robinson, 107 F.3d at 1022 (allowing courts to equitably toll certain Title VII cases), it is important to note that Doe was represented by the same counsel that

11

represents him in the instant matter.  To the extent that Doe failed to exhaust his claims, any

equitable considerations must be evaluated in light of the fact that Doe was represented

throughout the administrative and judicial processes.  And although some of the evidence

presented to the Court is troubling, especially with regard to the behavior of Doe's coworkers,

Doe has not advanced a sufficiently strong reason to excuse the voluntary withdrawal of his

claims at the administrative level.

Therefore, the Court will dismiss Doe's age and religious discrimination claims because

he failed to exhaust those claims.

### 2.     Doe did not exhaust his perceived-mental-disability claim and such exhaustion is not excused in this case

Unlike Doe's age and religious claims, which Doe raised at the EEO level, Doe did not

include a perceived-mental-disability claim in his formal EEOC complaint.  Defendant

accordingly argues that Doe cannot proceed on this claim because he failed to exhaust it.  A

plaintiff seeking relief against a federal employer for employment discrimination under the

Rehabilitation Act must exhaust Title VII remedies before bringing suit.  Spence v. Straw, 54

F.3d 196, 201 (3d Cir. 1995).  But, the Third Circuit has held that in situations where "the acts

alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint,

or the investigation arising therefrom," Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)

(emphasis added), the Title VII exhaustion requirement is relaxed, see also Wilson v. MVM,

Inc., No. 05-3204, slip op. at 14-15 (3d Cir. Jan. 29, 2007) (holding that Waiters applies with

respect to the prudential exhaustion requirements of the Rehabilitation Act).

In this case, Doe does not claim that the "the core grievances in the suit filed and the

earlier EEOC complaint were the same," Antol, 82 F.3d at 1295, or that the disability claim is an

"explanation[] of the original charge," Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 399

(3d Cir. 1976).  Nor does Doe proffer "evidence of any agency impropriety" in the course of the

EEOC investigation, Spindler v. SEPTA, 47 F. App'x 92, 95 (3d Cir. 2002), or show that the

EEOC's investigation was materially incomplete, Robinson, 107 F.3d at 1026.  Rather, he asserts

that "a reasonable investigation of [his] formal complaint would have explored the subject,"

(Doe's Br. in Opp'n 32) because the Navy was aware that he had previously undertaken a

psychological evaluation in order to obtain a security clearance in 1990 and because his 1991

EEO complaint alleged discrimination on the basis of mental handicap.  (Id.)  The 850-page

investigation report, however, did not reveal such a claim.  Additionally, even though the EEO

permitted Doe to amend his complaint to include additional claims on several occasions, he did

not raise a claim of perceived-mental-disability discrimination.  As such, Doe's disability-

discrimination claims will be dismissed.[7]

> **3.     Doe did not exhaust his constructive-discharge claim at the
> administrative level and such exhaustion is not excused in this case**

In his federal complaint, Doe alleges that his retirement constituted a constructive

discharge.  Defendants argue that Doe failed to exhaust a constructive-discharge claim, as

evidenced by the fact that Doe's retirement came after the EEOC granted summary judgment

against him.

Doe readily admits that he did not exhaust his constructive-discharge claims.  Instead,

Doe cites this Court's opinion in Kiburz v. England, No. 04-2247, 2005 WL 2314152, at *4-6

---

[7] Doe also alleged in his federal complaint that he was discriminated against on the basis
of sex.  However, Plaintiff did not charge sex discrimination in his formal EEO complaint, nor
has he indicated that a reasonable investigation would have revealed a basis for such a claim.

(M.D. Pa. Sept. 21, 2005), for the proposition that exhaustion was not required because Doe's

retaliation claims raised in the formal EEO complaint and his constructive-discharge claim are

"based on the exact same set of facts," and involve the same "core grievance."  (Doe's Br. in

Opp'n 29-30.)

        In <u>Kiburz</u>, the plaintiff filed a disability-discrimination complaint to the Merit System

Protection Board ("MSPB") alleging that the defendant failed to accommodate his disability.

After an ALJ denied his complaint, and during an appeal of the ALJ's decision, the plaintiff

accepted early retirement.  The plaintiff then filed a second complaint to the MSPB based on the

same facts as the first complaint, but alleging that his retirement constituted a constructive

discharge.  The ALJ dismissed the second complaint because the appeal of the first complaint

was still pending.  In the order, the ALJ required that the plaintiff file a "notice of intent to

refile" within fifteen days after the MSPB made a final decision on the appeal.  When the MSPB

denied the plaintiff's appeal, he filed a complaint in federal court alleging both failure-to-

accommodate and constructive-discharge claims.

        The defendant then moved to dismiss the plaintiff's constructive-discharge claim for a

failure to exhaust.  This Court then considered and rejected the defendant's argument that the

Supreme Court's holding in <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101, 122

(2002), effectively overruled the Third Circuit's holding in <u>Waiters</u> that exhaustion is not

required for "acts alleged in the subsequent Title VII suit [that] are fairly within the scope of the

prior EEOC complaint, or the investigation arising therefrom."  729 F.2d at 237.  Accordingly,

this Court found that under <u>Waiters</u>, Kiburz's constructive-discharge claims did not need to be

exhausted.

But the factual scenario presented in Kiburz differs from this case in an important way. In Kiburz, the constructive-discharge claim was raised before a final decision on the disability-discrimination claim had been rendered, and could fairly be considered within the scope of the prior MSPB investigation.  In this case, Waiters does not save Doe's constructive-discharge claim, because the basis for his claim did not arise until after the EEOC had rendered its final decision.  Compare Crumpton v. Potter, 305 F. Supp. 2d 465, 476 (E.D. Pa. 2004) (plaintiff did not exhaust a retaliation claim occurring six days after a final decision of the EEOC "[b]ecause Crumpton's denial of overtime . . . could not have been within the scope of the agency's investigation."); see also Graham v. Gonzales, No. 03-1951, 2005 WL 3276180, at *5 (D.D.C. Sept. 30, 2005) (refusing to excuse exhaustion of claims that were "the culmination of, and part of, [a] claim as to which [the plaintiff] did exhaust his administrative remedies.").

In Kiburz, this Court did not read Waiters to cover discriminatory acts that could not logically have been presented within the scope of a complaint, and will not do so now.  Rather, Waiters continues to apply: when an "incident (1) falls within the scope of a prior EEOC complaint, or (2) falls within the scope of the EEOC investigation which arose out of it," Robinson, 107 F.3d at 1025, the technical requirements of exhaustion are relaxed.

Therefore, Doe's constructive-discharge claims will be dismissed.

**B.      Doe's Title VII retaliation claims**

Defendant also seeks summary judgment as to Doe's retaliation claims.  To state a prima facie Title VII retaliation claim, a plaintiff must proffer evidence to establish three separate elements: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation

in the protected activity and the adverse employment action." <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting <u>Nelson v. Upsala Coll.</u>, 51 F.3d 383, 386 (3d Cir. 1995)).  In this case, only the second and third elements are in dispute.

To prove the second element of a prima facie retaliation claim, a plaintiff must show that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Moore</u>, 461 F.3d at 341 (quoting <u>Burlington N. & Sante Fe Ry. Co. v. White</u>, 126 S. Ct. 2405, 2415 (2006)).  In this case, Doe asserts that several employment actions taken against him were materially adverse.  Specifically, Doe alleges that his temporary suspension from classified information, his involuntary lateral transfer, the decision not to reinstate him to his position, and his non-selection for promotion constitute materially adverse employment actions.  Based on these allegations, the Court finds that a jury could conclude that a reasonable worker might have been dissuaded from engaging in protected activity.  Therefore, Doe's claims meet the second element of a <u>prima</u> <u>facie</u> case.

Doe fares much worse under the third element, however.  To show a causal connection, a plaintiff must be able to present evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action." <u>Kachmar v. Sungard Data Sys.</u>, 109 F.3d 173, 177 (3d Cir. 1997) (quoting <u>Zanders v. National R.R. Passenger Corp.</u>, 898 F.2d 1127, 1135 (6th Cir. 1990)).  When engaging in this inquiry, the Court must consider each case "with a careful eye to the specific facts and circumstances encountered." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 279 n.5 (3d Cir. 2000).

      **1.**     **Doe cannot show that a causal connection exists between his prior EEO activity and the decisions to involuntarily transfer him laterally**

16

As an initial matter, the Court notes that more than three years elapsed from the time that Doe began an EEO pre-complaint process in 1998 and the decision to involuntarily transfer Doe to a nonsupervisory position in January 2002.  Over ten years transpired from the date when Doe filed his first EEO complaint in 1991.  Certainly, the span of time between a protected act and an adverse employment action is not conclusive as to the existence of a causal connection.  See Kachmar, 109 F.3d at 178 ("By summarily concluding that there was too great a gap between Kachmar's protected acts and her termination, the district court failed to give Kachmar the opportunity to delve further into the facts by discovery.").  Nevertheless, temporal proximity is a factor that a court should consider when determining whether plaintiff has met the burden to show a causal connection.  See, e.g., Robinson v. SEPTA, 982 F.2d 892, 895 (3d Cir. 1993)(noting that on a "clearly erroneous" standard that, without intervening circumstances, the court "might be hard pressed" to find a causal connection with a two-year gap)[8]; Brodetski v. Duffey, 199 F.R.D. 14, 20 (D.D.C. 2001) ("Although courts have not established the maximum time lapse between protected Title VII activity and alleged retaliatory actions for establishing a causal connection, courts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length.").

Also critically important in this case is the fact that Defendant has proffered uncontroverted evidence that none of the individuals responsible for taking the adverse employment actions against Doe were aware of his prior EEO activity.  SMF 139-52; compare

---

[8] In Burlington Northern, the Supreme Court rejected Robinson on other grounds.  See Moore, 461 F.3d at 341 (discussing the Supreme Court's disagreement with the Third Circuit's approach with regard to the second element of a prima facie retaliation claim).

Iyer v. Everson, 382 F. Supp. 2d 749, 758 (E.D. Pa. 2005) (finding no causal connection when unrebutted evidence showed that the decisionmaker had no knowledge of plaintiff's EEO complaints).  Although Doe asserts by speculation that the filing of his EEO complaints was "common knowledge," the record clearly demonstrates that his supervisors were not aware of Doe's prior EEO activity.  (See, e.g., R. 98, 110, 128.)  Without evidence of a causal connection between the protected activity and the adverse employment actions, Doe's retaliation claim related to his involuntary transfer cannot survive summary judgment.

> **2.      Doe cannot show that the decisions not to reinstate him to his previous position or promote him was retaliatory**

Doe also cannot show that a causal link existed between his formal EEO complaint filed in March 2002 and the decision not to return him to his former position after his security clearance was reinstated.  The sworn affidavit and deposition testimony of Leonard Faerber, Doe's second-level supervisor, establishes that the decision not to return Doe to his former position was made solely by Faerber.  (R. 56; Faerber's Dep. 71-77.)  Faerber testified that he made his decision because "it was a non-starter to even broach the subject with the executive officer to have him move back.  Even if I had doubt and had talked the [executive officer] into it, I don't think the [executive officer's] position with regard to future conflict with those employees was going to change."  (Faerber's Dep. 73, ¶¶ 9-17.)  Further, it is undisputed that Doe's reassignment was permanent, and Doe has proffered no evidence that otherwise allow a reasonable factfinder to "conclude anything other than that [Faerber] would have made exactly the same decision [not to reinstate Doe, even if] he had never filed an EEOC complaint."  Sarullo v. United States Postal Serv., 352 F.3d 789, 801 (3d Cir. 2003).  Similarly, with respect to his failure-to-promote claims, Doe has proffered no evidence that the selection committee knew of

his protected activities.  Accordingly, Doe has not established a prima facie retaliation claim

based on the decisions not to reinstate him to his former position or promote him.

### D.    Doe's Privacy Act claims

Doe alleges that Defendant violated his rights protected under the Privacy Act, 5 U.S.C.

§ 552a, by disclosing his security records to various unauthorized individuals.  The Privacy Act

prohibits unauthorized disclosure of certain records about an individual without consent,

§ 552a(b), and permits an aggrieved plaintiff to seek relief in a civil action when a violation

occurs, § 552a(g)(1).[9]  In order to bring an action to enforce these rights, the plaintiff must file a

complaint within two years "from the date on which the cause of action arises," or from the date

that a plaintiff discovers that an agency "materially and willfully misrepresented any information

required . . . to be disclosed to an individual." § 552a(g)(5).[10]  This two-year limitations period

---

[9] The Court will assume, without deciding, that Doe could state a Privacy Act claim in this case.  However, the Court notes that the disclosure prohibition is subject to several enumerated exceptions that might apply in this case, including disclosure to "officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties."  § 552a(b)(1).

[10] In an unpublished per curiam opinion, the Third Circuit stated that "[t]he statute of limitations is a jurisdictional prerequisite to filing suit under the Privacy Act."  Weber v. Henderson, 33 F. App'x 610, 611 (3d Cir. 2002) (citing Bowyer v. U.S. Dep't of the Air Force, 875 F.2d 632, 635 (7th Cir. 1989)).  In 1987, the Seventh Circuit held that "a plaintiff's failure to file suit within the [Privacy Act's two-year limitations period] deprives the federal courts of subject matter jurisdiction over the action."  Diliberti v. United States, 817 F.2d 1259, 1262 (7th Cir. 1987).  Since Diliberti, several courts of appeals followed its holding that courts lack subject-matter jurisdiction over untimely Privacy Act claims.  See Hearrll v. Fleming, 285 F.3d 1292 (10th Cir. 2002); United States. v. Lindert, 142 F.3d 437 (Table) (6th Cir. 1998); Doe v. NSA, 165 F.3d 17 (Table) (4th Cir. 1998); Akutowicz v. United States, 859 F.2d 1122, 1126 (2d Cir. 1988); Reyes v. Supervisor of Drug Enforcement Admin., 834 F.2d 1093, 1096 (1st Cir. 1987).
In 2003, in light of Supreme Court precedent in Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95 (1990), the United States Court of Appeals for the District of Columbia Circuit rejected the view that the Privacy Act limitations period is jurisdictional.  Chung v. United States

runs from the time "when the individual knows or has reason to know" of the alleged violation.

Green v. Westphal, 94 F. App'x 902, 904 (3d Cir. 2004); Tijerina v. Walters, 821 F.2d 789, 798

(D.C. Cir. 1987).

In this case, Doe concedes that he knew as early as January 11, 2002, that the contents of

his security records had been disclosed to certain individuals within the command structure.[11]

(Doe's Dep. 28-29, 193-94; Doe's Br. in Opp'n 8.)  Yet Doe brought this action on September

29, 2004, more than two years later.  Doe invokes the discovery rule and the equitable-tolling

doctrine identified by the Third Circuit in Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d

1380, 1385 (3d Cir. 1994), to justify his claim's timing, arguing that he was not aware until after

September 29, 2002, that the disclosure may have been implicated his Privacy Act rights.

Oshiver, relied on by both parties for opposite propositions, involved a gender-

discrimination complaint filed under Title VII.  Oshiver, an hourly associate attorney at the

defendant firm, was dismissed from her position "with the explanation that the firm did not have

sufficient work to sustain her position . . . but that the firm would contact her if either additional

hourly work or [a full-time] associate position became available."  Id. at 1384.  During an

unemployment benefits hearing over a year later, Oshiver learned that the defendants hired a

---

Dep't of Justice, 333 F.3d 273, 278 n.* (D.C. Cir. 2003) (overruling Griffin v. United States
Parole Comm'n, 192 F.3d 1081, 1082 (D.C. Cir. 1999)); see also Harris v. F.A.A., 353 F.3d
1006, 1013 n.7 (D.C. Cir. 2004) (describing Chung as "express[ing] doubt about the
jurisdictional nature" of the Privacy Act's limitations period).   The Third Circuit has not
expressed any opinion on the jurisdictional nature of Privacy Act's limitations period since
Chung.

[11] Doe testified in deposition that when his supervisors called him on January 11, 2002,
he "[sat] there saying to myself, what the hell are they doing with my paperwork.  And I didn't
sleep at all that night, and it just went downhill from there.  It just – It was really bad.  The effect
[it] had on me health wise physically –." (Doe Dep. 29.)

male attorney to replace her shortly after her dismissal, and later hired a male full-time associate

attorney.  Id.  Although she filed discriminatory discharge and discriminatory failure-to-hire

claims with the Pennsylvania Human Relations Commission and the Equal Employment

Opportunity Commission shortly after learning of defendant's actions, she did not file within 300

days of her dismissal as required under Title VII.  The district court dismissed Oshiver's

complaint for failure to timely exhaust her administrative remedies.

On appeal, the Third Circuit described two doctrines that operate to lengthen a limitations

period: the discovery rule and "equitable tolling."  The first of the two doctrines, the discovery

rule, delays the accrual of a cause of action until a "potential claimant is either aware, or should

be aware, of the existence of and source of an injury," id. at 1386, because the injurious effects

of a legal wrong will in many cases not materialize until a later date.  But once a claimant is

made aware that he or she has been harmed, the limitations period begins to run irrespective of

knowledge that the harm is legally actionable.  Id. ("awareness of actual injury, as opposed to

legal injury, is sufficient to trigger the running of the statutory period").  Thus, in Oshiver's case,

the Third Circuit held that the discovery rule did not apply because the limitations period began

running immediately as of her injury (her dismissal), even though she did not know that she had

a legal cause of action until months later.  In this case, the application of the discovery rule is

straightforward; Doe admits that he was aware in January 2002 that the Defendant had disclosed

his security records, which led to his removal of access to classified information and his

reassignment to a non-supervisory position.  That he did not realize that the disclosure could

have supported a cause of action until much later is inapposite to the discovery rule.

The second doctrine recognized in Oshiver, equitable tolling, extends the limitations

period by "stopping the clock" when the equities of a case require it.[12]  Unlike the discovery rule,

which begins the tolling period upon a plaintiff's awareness of injury (as opposed to the

existence of a cause of action), equitable tolling "keys on a plaintiff's cognizance, or imputed

cognizance, of the facts supporting the plaintiff's cause of action." Id. at 1390.  The Third

Circuit has recognized the availability of equitable tolling in at least three situations: "(1) where

the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where

the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3)

where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." Id. at

1387.  In this case, none of these situations is applicable.  There is no dispute (beyond Doe's

speculation) that Defendant did not actively mislead Doe by representing that the disclosure of

his security records was for any reason other than to follow-up on the hotline call.  There are no

extraordinary circumstances that barred Doe from bringing a Privacy Act claim, and when he

brought it, he brought it in the correct forum.[13]  Doe has not – in his complaint or through

proffered evidence – provided sufficient support for the application of the equitable tolling

doctrine.

> Accordingly, Doe's Privacy Act claim is untimely, and will be dismissed.

---

[12] The Court notes that if Weber v. Henderson, supra note 10, is correct that the Privacy Act's limitations period is jurisdictional, then equitable tolling would be unavailable in this case. As the Third Circuit has made clear, "[w]here the filing requirements are considered 'jurisdictional,' non-compliance bars an action regardless of the equities in a given case." Oshiver, 38 F.3d at 1387 (quoting Hart v. J.T. Baker Chem. Co., 598 F.2d 829, 832 (3d Cir. 1979).  The Court need not resolve this issue, however, because equitable tolling would not apply in this case.

[13] The Court also notes that Doe was represented by counsel during most of the limitations period.

**IV.    DOE'S MOTIONS**

Although the Court will grant Defendant's motion for summary judgment, three outstanding motions filed by Plaintiff require some discussion.  Plaintiff has filed a motion for default judgment or spoliation instruction (Doc. No. 39), a motion to re-open the record (Doc. No. 97), and a motion to continue proceeding pseudonymously (Doc. No. 83).  The Court will address each in turn.

In his spoliation motion (Doc. No. 39), Doe asks this Court to "deny any dispositive motion that the Defendant files," "give an instruction on the spoilation [sic] inference," or enter default judgment against Defendant.  (Doc. No. 40, at 25.)  He requests these sanctions because he believes that Defendant has deliberately attempted to thwart discovery by destroying evidence and otherwise has frustrated his "attempt to seek and obtain evidence."  (Doc. No. 40, at 23.)  The crux of Doe's motion is that the Navy withheld or destroyed emails during discovery.

Defendant responds that "Plaintiff is correct that he did not receive any materials related to those matters because when plaintiff asked for them during discovery, the Navy objected to their production on grounds of relevancy (and burdensomeness)."   (Doc. No. 67, at 6.)  Nonetheless, Doe contends "it appears as if some documents were destroyed simply because no one ever told people that because of Mr. Doe's EEO complaints, relevant documents should be retained until the litigation was resolved."  (Doc. No. 72, at 18.)  This contention fails because Defendant has established that "the back-up tapes of e-mails were <u>not</u> destroyed but, rather, were retained" (Doc. No. 67, at 8) (emphasis in original), and ultimately produced.  Upon these considerations, the Court finds that Defendant did not destroy or otherwise improperly thwart the discovery of relevant evidence.

Even if Doe's claims had merit, the onerous sanction of default judgment or a spoliation instruction would be inappropriate.  The Third Circuit has established a three-factor test when considering the degree of sanctions appropriate for spoliation:

> (1) [T]he degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).  Weighing these factors, it is clear that sanctions are not justified.  Doe has not shown that Defendant intended to destroy or alter any evidence.  Nor is it the case that the merits of Doe's case would be adversely affected by such evidence, particularly because Doe abandoned many of his claims at the EEO level.  In terms of the degree of appropriate sanction, Doe asks this Court to punish the Navy to "set an example."  (Doc. No. 40, at 25.)  Finding that his allegations of wrongdoing by Defendant lack merit, the Court will deny the motion.

On February 6, 2007, Doe moved to re-open the record and further depose Captain Naber based upon evidence produced by Defendant after discovery had closed.  (Doc. No. 97.) Included in the newly produced evidence were calendar entries of Captain Naber that included notes pertaining to the events surrounding the revocation of Doe's security clearance and transfer.  In particular, Doe states that "a reasonable jury reading the comments . . . could reasonably find that the Navy had a personnel problem between an anti-Semitic employee and his Jewish supervisor, which the Navy chose to resolve by moving the Jewish supervisor through misuse of security regulations instead of disciplining or removing the offending anti-Semitic employee."  (Doc. No. 98, at 7-8.)  However, even if a further deposition would shed light or

24

provide support for Doe's religious discrimination claims, it would not affect the disposition of

this case; even with the additional evidence, Defendant would be entitled to summary judgment

because Doe abandoned his religious discrimination claims at the administrative level, and

therefore failed to exhaust his administrative remedies.  As such, the Court will deny the motion

to re-open the record as moot.

Finally, because judgment will be granted in Defendant's favor, Doe's motion to

continue pseudonymously (Doc. No. 83) will be denied as moot.

**V.       CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment will be granted,

and Plaintiff's remaining motions will be denied.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:04-CV-2170** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **DONALD C. WINTER, Secretary of the** | : | |
| **United States Department of the Navy,** | : | |
| **Defendant** | : | |

**ORDER**


     **AND NOW**, on this 5th day of April, 2007, for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT** Defendant's motion for summary judgment (Doc. No. 41) is **GRANTED**.  **IT IS FURTHER ORDERED THAT** Plaintiff's spoliation motion is **DENIED**.  (Doc. No. 39.)  Plaintiff's remaining motions (Doc. Nos. 83, 97) are **DENIED** as moot.  The Clerk shall enter judgment in Defendant's favor.


                    s/ Yvette Kane
                    Yvette Kane, Chief Judge
                    United States District Court
                    Middle District of Pennsylvania